Yes, certainly, Counsel. Good morning, Your Honors. I'm Michael Bernays. I'm here on behalf of Johnny Orsinger. We are here to consider the effects of the government actions on the morning of November 5, 2001, on into the afternoon in interrogating this 16-year-old Native American child in a manner which deprived him of access to counsel, to meaningful parental advice, and which subjected him to one of the most cruel and unnecessary coercive events that I in my 24 years of practice have seen. You're talking about this child who's just slaughtered a bunch of people, this 16-year-old Native American little wimpy child, right? That's who we're talking about? Yes, Your Honor. I just wanted to make sure we were on the same page. We are on the same page, Your Honor, and he was a child, and he was convicted of those crimes, and in my 24 years of criminal defense practice, I have trusted this Court and other courts to not be outcome determinative, to not look at the guilt of an individual in deciding whether or not he was afforded those protections that our Constitution affords to all criminally accused individuals. I'm glad you're instructing us on your 24 years. Why don't we go on? Your Honor, I don't mean to instruct you, but I feel it's very important that we need to get beyond the facts of the case, because they are horrible. They are horrible, and yet that doesn't excuse you. Do we have any more than the question of whether, yo, when I get an attorney constitutes an unequivocal request for counsel? Is there more than that to that issue of how he was treated on that morning? Yes, Your Honor, there is, and that has to do with whether or not he was afforded the protections of 18 U.S.C. 5033, the Juvenile Delinquency Act, which requires that parents be notified of the arrest, of the right to counsel, and that the juvenile be presented forthwith and without delay to the United States magistrate. Well, let's start with, yo, when do I get an attorney? Very well, Your Honor. And your position is that that falls within Alvarez rather than Doe, is it? It is, Your Honor, because, as they say, experience is the lifeblood of the law, and in experience, I doubt that this Court has ever heard the phrase, yo, when do I get an attorney, offered in anything other than what we might call gangsta speak. And, in fact, Special Agent Kirk, who conducted the interrogation, said that he took that to be a gang-related mode of speech. So if you think about it in that context, it's not somebody coming in and saying very politely, yo, when do I get an attorney? It's coming in with this gangsta attitude that pervades America these days, yo, when do I get my attorney? And a statement such as that should lead to something other than my name's not yo, which is what this officer said. He said, my name's not yo, and here are what your rights are, and this will tell you everything you want to know. Yes, Your Honor, and he provided a learning disabled 16-year-old Native American with a written explanation of his rights, did not explain them orally to him, had his father sign off as a witness prior to presenting them to Mr. Orsinger, Johnny Orsinger, for signature, and merely said to him, just sign here. His father was there? His father was there in handcuffs, Your Honor. Would his father have told him if there was some problem with getting in there? Your Honor, his father had a palpable conflict of interest. Was he a learning disabled, the father? I don't know what the father was, except that he was. You don't know, but he could have. He read those rights. He could have said there was some, you know. Your Honor, he was under arrest for the very same crime. He was being taken out immediately upon telling his son to waive his rights. They had a 15-second discussion. He and Agent Kirk had had a discussion in Spanish, which Johnny Orsinger does not understand, and that can't be a meaningful consultation with the parent. It simply doesn't comply with what Wendy Gee suggests. Oh, well, aren't they meaningful consultations now? Yes, Your Honor. This Court has required under 18 U.S.C. 5033 that the juvenile have a meaningful consultation with their parent. And in the context of this interrogation, when dad is under arrest for at least part of the same crimes that the son is under arrest for and is given all of 15 to 20 seconds to consult with his son, that simply cannot constitute the meaningful. But why is this a conflict of interest? Father and son, it would seem to me they were going to be hung together or support each other. Why was there a conflict? Because the father had, when we get into the facts of the trial or the facts of the event, the father had wrecked a car on the way to where they had carjacked these two guys out of the lake at a bootlegging party, taken their car, tied them up. Johnny and Gregory Nakai were driving the stolen car with the victims in the back still alive. Teddy Orsinger, the father, was following in Gregory Nakai's car and wrecked it on the way there. After that car was righted and everybody started heading off again, Teddy Nakai ran off into the forest and did not accompany the people to the scene where the homicides took place. So he did have very differing interests and every interest in distancing himself from the homicide that had ultimately taken place after he had run off. But what was the conflict between him and his son? He didn't want to be convicted of the murder. How did that hurt him to have his son acquitted? Well, Judge, I guess I don't know the precise point. Well, you don't know the conflict. You said there was a conflict. I haven't heard the conflict. Yes, Judge, I did. There are different facts, yes. The conflict was that his interests in exonerating himself were entirely apart from any of his interests. They were separate, but they were not in conflict as far as you've described it. Your Honor, I would respectfully disagree with you as to the conflict. What was the conflict, then? The conflict was that if his son was found to be primarily responsible for those homicides, it lessens his degree of culpability. It's done every day in trials, as this Court well knows, that a defense is, I wasn't culpable, the fellow sitting over there is the culpable one. And that's the conflict of interest. That's why we have different counsel. If this Court were reviewing the same lawyer representing Teddy Orsinger and Johnny Orsinger at that interrogation, this Court would find without question that there was a conflict of interest on that lawyer's part. And the conflict exists in the people being interrogated. Did the Court have any other questions on this issue? Because I'd like to go on to the other issues. All right. You've got about two and a half minutes total. Well, very briefly, I think that dragging Johnny up the hill to look at the mutilated corpses is clearly a coercive atmosphere not dispelled by anything other than putting him in the company of the agent that had done that to him. And all of the statements concerning his involvement in the shooting case, which is, I believe, before this Court under 03-10500, came as a result of the interrogation that immediately followed that. Getting back then, if I may, Your Honor, to the issue of the Juvenile Delinquency Act, I would urge this Court to find that we have shown, we have proven the collaboration between tribal and Federal officers that is required by the case law of this circuit to establish that although it was a tribal police officer who physically grabbed up Johnny at the school and brought him into the FBI. As I understand the test, it's a joint planning or collaboration plus an intent to deprive him of a Federal right. Yes, Your Honor. And you have the joint planning in the task force meeting that was the --- Where do you show the intent to deprive him of a Federal right? In the decision to have him arrested on a tribal warrant when the U.S. Attorney's Office knows full well that the Indian Civil Rights Act sets the same standard for Fourth Amendment analysis as does the Fourth Amendment, and to say we don't have probable cause to arrest on a Federal case, but we do have probable cause, or at least we can convince the tribal judge that we have probable cause under an Indian Civil Rights Act analysis is absolutely an intent to deprive him of the protections of the Federal system, even though they were wrong in that. Are the offenses the same under both statutes? Can you try under the Indian Tribal Act, can you try him for all of the same crimes you can try him for under Federal law and vice versa? No, Your Honor. I don't believe the tribe has any jurisdiction over the homicide. And are there acts under the Tribal Act that the Federal Government doesn't have jurisdiction under Federal law? None pertinent to this case, Your Honor. I'm sure that the Noliho Tribal Code contains crimes that are not recognizable in Federal court. So all of the acts that he could have been charged with under the Tribal law he could have been charged with under Federal law? Yes, Your Honor. And if I have any time left, which it looks like I don't, but I would like to beg the Court's indulgence for a brief rebuttal nonetheless. I'll give you a brief rebuttal. Thank you. May it please the Court again, I'm Vincent Kirby. Your Honor, we will submit as to the first argument about when do I get a lawyer, that the defendant, while described as a young child of 16 and a half, was an experienced child of 16 and a half. He had previously been afforded the services of an attorney on two prior occasions in juvenile proceedings in New Mexico. He was ---- So he knew he was entitled to an attorney? A fair reference, a fair inference and a fact to be determined or taken into consideration by the Court below. When he said, yo, when do I get an attorney, that meant he knew he was entitled to one and wanted one? No. It means that he knew ---- I thought that's what you're trying to tell us, that he was experienced, knew all about getting an attorney. No, Your Honor. He's experienced in terms of he had heard the rights before. He knows about the proceedings. This is not a neophyte, first time to the system. And he did not say, as is abundantly clear in the case law, that he did not say, I want a lawyer. He did not say anything that could be construed in that matter. And he was afforded ---- But if he was so experienced, what do you think he was asking? He was asking what time he gets an attorney? Yes, exactly, Your Honor. And that case would be the ---- But if he was so experienced, he knew he was entitled to it then, right? He make it ---- whether he was or not, the judge is asking for a conclusion. He did not make the statement. The case law is that he has to say something that can be reasonably construed as an invocation of counsel. One could infer that he knew and chose not to say, I want one now. He was read his rights, asked, do you wish to ---- he was given his rights, he read them, asked, do you wish to waive them, he waived them. As to the second issue of the ---- what happened at the scene, there is no evidence, no indication of a need to coerce, to a need to set up, to loosen the tongue of the juvenile. It was an unfortunate scene, as the court below noted, created by the defendant. It was necessary that he be out there because they were trying to find the bodies. They had ---- The first issue, one second. Yes. Would you read the question, can I get a lawyer right now, the same way? Right now would be a defining moment. It would be a question, all right. Pardon? It would be a question about what are my rights. It could be interred as a ---- that's similar to what was happening in Alvarez-Gomez was can I get an attorney right now. Yeah. But Gomez turns on the fact that it was said three times. The question left unanswered by Gomez if he'd only said it one time. So if he said, yo, when do I get an attorney, three times, he would have been home free, right? No. I think the distinguishing factor in Gomez is he keeps saying right now. Three times he says right now at the end of his statement. That seems to ---- Okay. I want to take you back to your dismembered corpses. Your Honor, no intent to coerce. The defendant had made a confession earlier in the day to the grizzly scene. There was a physical break. They were looking for the bodies. One can sit here and argue about the actions of the agent upon being confronted with the decapitated corpse of a 9-year-old, what his reaction should have been, how he should have handled it. But in the totality of the circumstances, the other agent came over, removed him from the location, put him away from the agent. Agent Kirk also interceded in discussing for his rights. There was another criminal investigator during the taking of the statement. And the court did note or it is in the record that the statement by the defendant in light of all this is, oh, you're going to pin this one on me, too. Certainly not evidence of a will being overborne. And also in the record, although maybe not cited in the case, is that after that statement to Agent Purcell, Agent Duncan also went over and he described no tears, no shaking, no nervousness. And he got a written statement about the grandmother and granddaughter case. Finally, Your Honor, as to the third issue. The third issue. Do you agree with counsel that the Federal statute, the Federal offense, Federal crimes that he could have been prosecuted for cover all of the crimes that he could have been I cannot agree with that, Your Honor, because I don't know the full extent of the Navajo tribal code. There may be some other charges that were possible. But factually, the tribe can prosecute its members for offenses, maybe not named the same, but for that kind of conduct. And what was the reason for the arrest by the tribal officers rather than the Federal officers? The Federal officers in conjunction with the Federal prosecutor had determined at that point because this case presented a unique situation. We had statements by people that crimes had occurred, including murder. We did not have bodies. We did not have causes of death. You didn't have probable cause for the arrest? Any Federal crimes? The question at that point was trying to corroborate that there were Federal crimes. At that point, they had a statement of conformance. But how could there have been Indian crimes if there weren't Federal crimes? Pardon? How could there have been Indian crimes if there weren't Federal crimes? Well, all I can say, Judge, is that the criminal investigator took what he had to a tribal prosecutor and was taken to a tribal judge who made the decision that he found there was probable cause, a decision made by an assistant who did not think so versus a decision by a tribal judge who believed that for a criminal charge related to the tribal code, he had probable cause to issue arrest warrants, and he did. But the investigators met and discussed this, right? Yes, they did, Your Honor. And did the Federal officers suggest that they go to the tribal court? There was the testimony is that there was a question about whether or not tribal charges could be filed in connection with getting these people off the streets of the Navajo Indian Reservation. And how could they come to the conclusion that tribal charges could be filed but not Federal charges? They could not come to the conclusion. The question was asked. It was then presented to a tribal judge. There was no, hey, arrest them tribally and let's see. It was presented to a tribal judge. Why not present it to a Federal magistrate? There was a determination by the assistant that he did not feel, based on the facts that he had, knowing what we look down the road for in terms of murder. Normally we have to have a body, a determination of death other than natural. But the bottom line is, under the case, under Doe, under Percy, is no actual collaboration to deprive anyone. And remember, this is a ---- The Federal authorities would have to be arresting him for a felony, I take it. And the State authorities, it would be misdemeanors, correct? I don't believe they have prosecution authority. Do they under ---- He certainly couldn't be prosecuted for the felonies in the State. In the tribal court, I mean to say. They only have misdemeanor authority for such things as aggravated battery, robbery, things like that, but only at a misdemeanor level. Right. Okay. There's no evidence of actual collaboration to deprive. Remember, this case involved seven individuals. Expediency was part of this process of trying to get them off the street. There was no discussion, and I would encourage the Court to uphold the findings by the district court below, finding the agents to be credible, that there was, while there was discussion on the facts of the case and what to do, that there was no actual collaboration to deprive anyone of these seven of the Federal percent of the rights. Well, that's why I tried to ask you about the difference between the charges. The Court said there was insufficient evidence to obtain Federal search or arrest warrants, but there was sufficient evidence to obtain arrest warrants on tribal charges, and they jointly made that decision. And I was asking you what the difference were in the charges, and I didn't get any answer from you. Now, Judge Fernandez gave an answer, which seems to be, when you're adopting, that they could have tried him on tribal misdemeanor charges, which would not have constituted Federal charges. Is that correct? Well, I misunderstood the question. Judge Fernandez is correct. They have misdemeanor authority. It certainly is not a separate sovereign. It's not double jeopardy that they can proceed at a misdemeanor level, and that's what they chose to do. So when the district judge said that there was insufficient evidence to obtain Federal warrants, but sufficient evidence to obtain warrants on tribal charges, she was referring to the fact that there were misdemeanor charges that could be filed in tribal court. I believe that would be correct, Your Honor. Well, you can thank Judge Fernandez for an excellent theory. Your Honor, if there's nothing further, I'll be seated. I appreciate the Court's indulgence in a short rebuttal time, and I will keep it short. Let me address two particular points. One has to do with Alvarez. Mr. Kirby has suggested that it was the thrice-repeated question in Alvarez that distinguishes it from the instant case. If you look at the text of the decision in Alvarez, they reproduce the transcript of the interview. The only reason that question was repeated three times was because, first, the agent says, pardon me. When Alvarez first asks, can I have an attorney right now, he says, pardon me. And so Alvarez repeats his question. When he gets a positive answer, immediately he repeats again his question, you mean right now. In the instant case, we didn't have an agent who was willing to engage in that kind of civil discourse with our client. Instead, he simply said, my name's not Yo. So on the question of why arrest these people on the Federal or on the Tribal warrants instead of the Feds, Agent Duncan testified, and it's at page 203 of my volume 1 of excerpts of record, that the intent was to get them into custody and interview them. That's why they wanted to get the Tribal warrants. And I would urge the Court to find that every fact that they had, the missing people, the blood in the truck, the statement of the co-defendant, and Jimmy Nakai turned out to be a co-defendant, all of which was sufficient to get either a Federal or a Tribal warrant. And the only conclusion, the only reasonable conclusion that this Court should reach is that the reason they went Tribal was because they knew that they would have a greater opportunity to interrogate Johnny Orsinger if he was being held under a Tribal warrant and was not afforded the protections that he would have been had he been arrested on a Federal warrant. Do you know what the charges were under the Tribal warrant? I believe they were aggravated assault, Your Honor, and they were never pursued. They were dismissed as soon as Johnny was presented 24 days later to the Federal magistrate in Flagstaff. Were those charges that could have been brought Federally? Absolutely, Your Honor. They were not misdemeanor charges? I don't know how the Navajo – I'm not admitted to the Navajo Tribal Courts. I don't know how their code works. I know it's at least apocryphal among those of us in Arizona that the maximum sentence is a year in the Tribal jail system. Whether they denominate them misdemeanors or not, I don't know. Thank you, counsel. Thank you, Your Honors. The case just argued will be submitted. The final case of the morning will be McKay, U.S. v. McKay.
judges: Reinhardt, Noonan, Fernandez